UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: | Chapter 11 |
| Orion HealthCorp, Inc. | Case No. 18-71748 (AST) |
| Constellation Healthcare Technologies, Inc. | Case No. 18-71749 (AST) |
| NEMS Acquisition, LLC | Case No. 18-71750 (AST) |
| Northeast Medical Solutions, LLC | Case No. 18-71751 (AST) |
| NEMS West Virginia, LLC | Case No. 18-71752 (AST) |
| Physicians Practice Plus, LLC | Case No. 18-71753 (AST) |
| Physicians Practice Plus Holdings, LLC | Case No. 18-71754 (AST) |
| Medical Billing Services, Inc. | Case No. 18-71755 (AST) |
| Rand Medical Billing, Inc. | Case No. 18-71756 (AST) |
| RMI Physician Services Corporation | Case No. 18-71757 (AST) |
| Western Skies Practice Management, Inc. | Case No. 18-71758 (AST) |
| Integrated Physician Solutions, Inc. | Case No. 18-71759 (AST) |
| NYNM Acquisition, LLC | Case No. 18-71760 (AST) |
| Northstar FHA, LLC | Case No. 18-71761 (AST) |
| Northstar First Health, LLC | Case No. 18-71762 (AST) |
| Vachette Business Services, LTD. | Case No. 18-71763 (AST) |
| MDRX Medical Billing, LLC | Case No. 18-71764 (AST) |
| Vega Medical Professionals, LLC | Case No. 18-71765 (AST) |
| Allegiance Consulting Associates, LLC | Case No. 18-71766 (AST) |
| Allegiance Billing & Consulting, LLC | Case No. 18-71767 (AST) |
| Phoenix Health, LLC, | Case No. 18-71789 (AST) |
| Debtors. | (Jointly Administered) |

---

| | |
|---|---|
| Orion HealthCorp, Inc., *et al.,* | |
| Plaintiffs, | |
| v. | |
| Parmjit Singh Parmar (a/k/a Paul Parmar), Ravi Chivukula, Sotiros Zaharis, Naya Constellation Health, LLC, Alpha Cepheus, LLC, Constellation Health Investment, LLC, First United Health, LLC, Taira no Kiyomori LLC, Blue Mountain Healthcare, LLC, Destra Targeted Income Unit Investment Trust, on behalf of unitholders, a Delaware Statutory Trust, Constellation Health Group, LLC, Constellation | Adv. Proc. No. 18-08053 (AST) |

Health, LLC, United States of America and
Young Conaway Stargatt & Taylor, LLP (in its
capacity as Escrow Agent),

        Defendants.

      AND

Orion HealthCorp, Inc., *et al.*

        Plaintiffs,

v.

Capita IRG Trustees (Nominees) Limited, CHT
Holdco LLC, Blue Mountain Healthcare LLC,
PBPP Partners LLC, Axis Medical Services
LLC, Vega Advanced Care LLC, Forest
Nominees Limited GC1 ACCT, AAKB
Investments Limited, Pulsar Advance Care LLC,
Platform Securities Nominees Limited KKCLT
ACCT, Lexington Landmark Services LLC,
Mymsmd LLC, PPSR Partners LLC, Max
Edward Royde, PBPP LLB, UBS Private
Banking Nominees LTD Mainpool ACCT, Abn
Amro Global Nominees Limited 573 Main
ACCT, Alliance Trust Savings Nominees LTD
Cdigro ACCT, The Bank Of New York
(Nominees) Limited, The Bank Of New York
(Nominees) Limited SFTIF ACCT, Barclayshare
Nominees Limited, David Beardsall, Beaufort
Nominees Limited, Beaufort Nominees Limited
SSLNOMSACCT, BNY (OCS) Nominees
Limited HIT ACCT, Brewin Nominees Limited
Gross ACCT, CFS Portfolio Management
Limited, CGWL Nominees Limited GC1 ACCT,
Chase Nominees Limited, Chase Nominees
Limited Exdepaif ACCT, David Falcon Butler
Cole, Credit Suisse Client Nominees (UK)
Limited D6m5pb ACCT, FERLIM Nominees
Limited ISA ACCT, FERLIM Nominees Limited
Pooled ACCT, FITEL Nominees Limited SDPR
ACCT, Goldman Sachs International Creptemp
ACT, Harewood Nominees Limited 4121550
ACCT, HSBC Client Holdings Nominee (UK),
HSBC Global Custody Nominee (UK) Limited

Adv. Proc. No. 18-08048 (AST)

630372 ACCT, HSBC Global Custody Nominee
(UK) Limited 667656 ACCT, HSBC Global
Custody Nominee (UK) Limited 944287 ACT,
HSCB Global Custody Nominee (UK) Limited
982409 ACCT, Huntress (CI) Nominees Limited
KGCLT ACCT, Investor Nominees Limited,
Investor Nominees Limited WRAP ACCT,
Investor Nominees Limited Nominee ACCT,
James Capel (Nominees) Limited PC ACCT, Jim
Nominees Limited ISA ACCT, Jim Nominees
Limited Jarvis ACCT, Jim Nominees Limited
Jarvisnt ACCT, Johnston Asset Management
Ltd, John Joseph Johnston, Karin Johnston, J.P.
Morgan Securities Plc Jpcrepon Acct, Kbc
Securities Nv Client Acct, Lawshare Nominees
Limited Isa Acct, Lawshare Nominees Limited
Sipp Acct, Lawshare Nominees Limited Undoc,
Lawshare Nominees Limited Dealing, Paul
Lines, Lynchwood Nominees Limited 2006420
Acct, Merrill Lynch International Main Acct,
Morgan Stanley Client Securities Nominees
Limited, Morgan Stanley Client Securities
Nominees Limited Seg Acct, Nomura Pb
Nominees Limited Pbnoms Acct, Nortrust
Nominees Limited, Nortrust Nominees Limited
Tds Acct, Nortrust Nominees Limited Lua01
Acct, Nortrust Nominees Ltd Thd05 Acct, N.Y.
Nominees Limited, N.Y. Nominees Limited
Bccag Acct, Peel Hunt Holdings Limited
Pmprinc Acct, Pershing Nominees Limited Ccclt
Acct, Pershing Nominees Limited Elisa Acct,
Pershing Nominees Limited Imclt Acct, Pershing
Nominees Limited Jiclt Acct, Pershing Nominees
Limited Perny Acct, Pershing Nominees Limited
Rkclt Acct, Pershing Nominees Limited Rkisa
Acct, Pershing Nominees Limited Tmclt Acct,
Pershing Nominees Limited Wrclt Acct, Pershing
Nominees Limited Pqideal Acct, Platform
Securities Nominees Limited Kkisa Acct,
Platform Securities Nominees Limited Ashisa
Acct, Platform Securities Nominees Limited
Ashnom Acct, Platform Securities Nominees
Limited Ashpen Acct, Platform Securities
Nominees Limited Ashtru Acct, Rathbone
Nominees Limited, Redmayne (Nominees)
Limited P89813x Acct, Redmayne (Nominees)

Limited Rg2461r Acct, Rock (Nominees)
Limited Isa Acct, Rock (Nominees) Limited
Cshnet Acct, Rock (Nominees) Limited Taxfull
Acct, Rock (Nominees) Limited Fastrade Acct,
Securities Services Nominees Limited 2140036
Acct, Share Nominees Ltd, Skandinaviska
Enskilda Banken Ab (Publ) 2035260 Acct, Smith
& Williamson Nominees Limited Isa Acct, State
Street Nominees Limited G007 Acct, State Street
Nominees Limited Om01 Acct, State Street
Nominees Limited Om02 Acct, State Street
Nominees Limited Oq51 Acct, Stifel Nicolaus
Europe Limited Nnideal Acct, Svs Securities
(Nominees) Ltd Onl Acct, Td Direct Investing
Nominees (Europe) Limited Usisa15 Acct, Td
Direct Investing Nominees (Europe) Limited
Usnom15 Acct, Td Direct Investing Nominees
(Europe) Limited Usnom30 Acct, Td Direct
Investing Nominees (Europe) Limited Ussip00
Acct, Transact Nominees Limited Integra1 Acct,
Victoire Nominees Limited 2193900 Acct,
Vidacos Nominees Limited 2154 Acct, Vidacos
Nominees Limited Igukclt Acct, W B Nominees
Limited Isamax Acct, W B Nominees Limited
Treaty Acct, Wealth Nominees Limited Wrap
Acct, W H Ireland Nominees Limited Isa Acct,
and The United States of America, Department
Of Treasury, Internal Revenue Service,

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF CC CAPITAL CHT HOLDCO LLC AND
CHT HOLDCO, LLC'S MOTION TO INTERVENE AND REALIGN THE PARTIES**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................................1

THE MOVANTS AND RELATED PARTY ...............................................................................1

FACTUAL BACKGROUND ...................................................................................................2

    The Merger Negotiations ............................................................................................3

THE PURCHASE PROCEEDS ...............................................................................................8

    The Destra Litigation and Creation of the Young Conaway Escrow Fund.......................8

    Closing and Disbursement of Purchase Proceeds.............................................................10

    Discovery of the Fraud .................................................................................................13

    Proposed Settlement of the Destra Litigation.................................................................17

    Orion Bankruptcy Filing and Adversary Proceedings.......................................................20

CC HOLDCO'S AND CHT HOLDCO'S CLAIMS AND REMEDIES ....................................22

ARGUMENT .....................................................................................................................24

I.    CC Holdco Should be Permitted to Intervene as a Matter of Right in Both
    Adversary Proceedings, and CHT Holdco Should be Permitted to Intervene in the
    Parmar Adversary Proceeding as a Matter of Right. ........................................................25

    A.    CHT Holdco Has an Absolute Right to Intervene by Federal Statute in the
        Parmar Adversary Proceeding. .................................................................................25

    B.    CC Holdco and CHT Holdco Have an Interest in the Transaction and the
        Property That is the Subject of the Adversary Proceeding and Should be
        Permitted to Intervene as a Matter of Right. .............................................................26

    C.    Even if this Court Determines that Intervention as a Matter of Right is Not
        Warranted, CC Holdco and CHT Holdco Should, Nonetheless, be
        Permitted to Intervene. .............................................................................................28

II.    CHT Holdco Should Be Realigned as a Plaintiff in the Parmar Adversary
    Proceeding. ..................................................................................................................29

CONCLUSION ...................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Jankouskas*,
  452 A.2d 148 (Del. 1982) .........................................................................................24

*Adelphia Commc'ns Corp. v. Rigas*,
  285 B.R. 848 (Bankr. S.D.N.Y. 2002) ......................................................................26

*B.A.S.S. Group, LLC v. Coastal Supply Co.*,
  Civil Action No. 3743-VCP, 2009 Del. Ch. LEXIS 166 (Del Ch. June 19,
  2009).........................................................................................................................24

*City of Indianapolis v. Chase Nat'l Bank of City of N.Y.*,
  314 U.S. 63 (1941) ...................................................................................................29

*Destra Targeted Income Unit Investment Trust, Constellation Health Group, LLC
  and Constellation Health, LLC v. Parmjit Singh Parmar (a.k.a Paul Parmar),
  Naya Constellation Health LLC, Alpha Cepheus, LLC, Constellation Health
  Investment, LLC, First United Health, LLC, Constellation Health, LLC, Joel
  Plasco, Sotirios Zaharis (a.k.a. Sam Zaharis)*,
  Del. Ch., C.A. No. 13006-VCL ..........................................................................*passim*

*Gurney's Inn Resort & Spa Ltd. v. Benjamin*,
  743 F. Supp. 2d 117 (E.D.N.Y. 2010) ......................................................................30

*In re Caldor Corp.*,
  303 F.3d 161 (2d Cir. 2002) .....................................................................................26

*In re Parr*,
  17 B.R. 801 (E.D.N.Y. 1982) .....................................................................................2

*In the Matter of the Liquidation of Freestone Ins. Co.*,
  C.A. No. 9574-VCL ............................................................................................18, 19

*L-3 Commc'ns Corp. v. OSI Sys., Inc.*,
  418 F. Supp. 2d 380 (S.D.N.Y. 2005) ......................................................................30

*Matter of Marin Motor Oil, Inc.*,
  689 F.2d 445 (3d Cir. 1982) .....................................................................................26

*Md. Cas. Co. v. W.R. Grace & Co.*,
  23 F.3d 617 (2d Cir. 1993) .................................................................................29, 30

*New York News Inc. v. Newspaper & Mail Deliverers' Union of New York*,
139 F.R.D. 291 (S.D.N.Y. 1991), *aff'd*, 972 F.2d 482 (2d Cir. 1992) ....................................2

*Peterson v. Islamic Republic of Iran*,
290 F.R.D. 54 (S.D.N.Y. 2013)..............................................................................27

*Restor-A-Dent Dental Labs., Inc. v. Certified Alloy Prods., Inc.*,
725 F.2d 871 (2d Cir. 1984) ..................................................................................28

*Sec. Investor Protection Corp. v. Bernard L Madoff Inv. Sec. LLC*,
550 B.R. 241 (Bankr. S.D.N.Y. 2016) .............................................................26, 27

*Willis v. Firestone Bldg. Prods. Co.*,
231 F.R.D. 447 (D. Conn. 2005) ...........................................................................27

**Statutes**

11 U.S.C. §§ 101 ..............................................................................................13, 20

11 U.S.C. § 1109(b)......................................................................................1, 25, 26

11 U.S.C. § 362 .......................................................................................................20

Delaware Uniform Fraudulent Transfer Act ..........................................................21

**Other Authorities**

Fed. R. Bankr. P. 7024 .........................................................................................1, 25

Fed. R. Civ. P. 24 ............................................................................1, 2, 25, 26, 28

1 James W. Moore et al., *Moore's Federal Practice* ¶ 0.74[7] (2d ed. 1993)...............29

## INTRODUCTION

CC Capital CHT Holdco LLC ("CC Holdco") and CHT Holdco, LLC ("CHT Holdco") (collectively, "Movants"), pursuant to 11 U.S.C. § 1109(b) and Rule 24 of the Federal Rules of Civil Procedure (the "Federal Rules"), as made applicable in adversary proceedings by Rule 7024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), file this memorandum of law in support of Movants' consolidated motion [Doc. No. 16] (the "Motion") in the above-styled Adversary Proceedings seeking the following relief:

a.      CC Holdco moves to intervene as a plaintiff in both Adversary Proceedings; and

b.      Because CHT Holdco is erroneously named as a defendant in Adversary Proceeding No. 18-08048 (AST) (the "Capita Adversary Proceeding"), it moves for realignment of the parties in that action so that it is a named plaintiff, and it moves to intervene as a plaintiff in Adversary Proceeding No. 18-08053 (AST) (the "Parmar Adversary Proceeding," and together with the Capita Adversary Proceeding, collectively, the "Adversary Proceedings").

## THE MOVANTS AND RELATED PARTY

1.      CHT Holdco is the owner of all of the issued and outstanding shares of Debtor Constellation Healthcare Technologies, Inc. ("CHT"). CHT Holdco was formed in anticipation of the "go private" merger transaction that is the subject of the Adversary Proceedings. As more fully described below, in accordance with the terms and conditions of the Agreement and Plan of Merger, dated November 24, 2016, by and among CC Capital Management, LLC ("CC Capital"), Orion HealthCorp., Inc. ("Orion"), CHT Holdco, CHT Merger Sub, Inc. ("Merger Sub") and CHT (the "Merger Agreement"), CHT Holdco purchased or otherwise acquired one hundred percent (100%) of the issued and outstanding shares of CHT on or about January 30, 2017 (the "Merger"). CHT Holdco continues to own these shares.

2.      CC Holdco is the controlling member and managing member of CHT Holdco. CC Holdco was also formed in anticipation of the Merger.  As more fully described below, CC Holdco funded approximately $82.5 million in purchase proceeds paid by CHT Holdco to acquire CHT.

3.      CC Capital, who is not a movant, is the managing member of CC Holdco.  CC Capital is a private investment firm founded in or about early 2016, with a focus on investing in and operating high-quality companies for the long term.  At all times, CC Capital acted on behalf of CC Holdco in the negotiation and consummation of the Merger (even prior to the formation of CC Holdco and CHT Holdco).

## FACTUAL BACKGROUND

Movants recognize that Rule 24(c) provides that a motion to intervene should be "accompanied by a pleading that sets out the claim" of the proposed intervenors.  Courts in this Circuit have found that this provision does not necessarily require that a proposed complaint be included with a motion to intervene.[1]  Movants are not including proposed complaints as a part of this consolidated Motion, but provide this Factual Background setting forth the factual basis for their claims, including many of the factual allegations that would be included in intervenor complaints filed by the Movants:[2]

---

[1] *See, e.g.*, *New York News Inc. v. Newspaper & Mail Deliverers' Union of New York*, 139 F.R.D. 291, 293 (S.D.N.Y. 1991), *aff'd*, 972 F.2d 482 (2d Cir. 1992); *In re Parr*, 17 B.R. 801, 808 (E.D.N.Y. 1982).

[2] Movants will file their intervenor complaints within twenty-one (21) days of the entry of this Court's order granting this consolidated Motion, or within such other time as directed by the Court.

## The Merger Negotiations

1.      In or about early 2016, CHT first approached CC Capital about a potential

transaction in which CC Capital would acquire a controlling interest in CHT.  At the time,

CHT's shares traded on the London Stock Exchange's Alternative Investment Market ("AIM").

2.      Ultimately, these negotiations resulted in the Merger, pursuant to which CHT

Holdco acquired one hundred percent (100%) of the issued and outstanding shares of CHT.

Throughout the course of the negotiations and continuing for some period of time following the

closing of the Merger, Parmjit Singh Parmar (a/k/a Paul Parmar) ("Parmar") was CHT's Chief

Executive Officer; Sotiros Zaharis ("Zaharis") was CHT's Chief Financial Officer; and Ravi

Chivukula ("Chivukula") was the Secretary of CHT and the Chief Financial Officer of Orion,

CHT's largest operating unit by revenue.  Both Parmar and Zaharis also held seats on CHT's

Board of Directors.

3.      Prior to the Merger, various entities controlled by Parmar owned approximately

53.5% of CHT's outstanding shares.  Entities owned and controlled by Parmar's close associates,

including Zaharis and others, owned approximately 11.65% of CHT's outstanding shares.  The

balance of CHT's shares were owned by public shareholders.

4.      As a condition and inducement to the Merger, stockholders representing at least

89% of CHT's outstanding shares were required to execute and did, in fact, execute Voting and

Support Agreements in furtherance of the Merger.

5.      During the Merger negotiations and related diligence activities, Parmar acted as

principal on behalf of CHT and as the Seller Representative pursuant to the Merger Agreement.

Zaharis and Chivukula, as members of CHT's senior management, actively supported Parmar in

this effort and interacted directly with CC Capital in providing information regarding CHT's operations, financial condition, and other information relevant to the proposed Merger.

6.      CHT, Parmar, Zaharis, and Chivukula presented CHT as a growing force in the $37 billion medical billing industry.  Purportedly, CHT's business model drove economies of scale through the acquisition and consolidation of small to mid-sized medical billing firms, offshoring of certain business functions, and a significant investment in proprietary technology. Following this model, CHT, Parmar, Zaharis, and Chivukula stated that CHT had expanded operations into 26 states through significant organic growth and a string of acquisitions, including MDRX Medical Billing, LLC ("MDRX"); Phoenix Health, LLC ("Phoenix"); and NorthStar First Health, LLC ("NorthStar").

7.      Moreover, CHT, Parmar, Zaharis, and Chivukula stated that CHT's revenue and EBITDA were growing rapidly and continually exceeded expectations following its initial public offering and listing on the AIM in December 2014.  For instance, CHT's EBITDA was presented as having increased in 2014 by 104% to $14.2 million and another 68.3% to $23.9 million in 2015.  Similarly, revenue was represented as having grown by more than 40% to $76.7 million in 2015, with CHT's strategic acquisitions during that year purportedly contributing $15.5 million to the company's growth (20.2% of all revenues). Organic revenue also purportedly increased by $10 million at a rate of 12% in 2015.

8.      Importantly, CHT, Parmar, Zaharis, and Chivukula represented that for the six-month period ended June 30, 2016, CHT's revenues were approximately $57 million and its EBITDA was approximately $21 million.  And, for the year ended December 31, 2016, CHT's revenues for 2016 were reportedly approximately $136 million and its EBITDA as of that date was represented to be approximately $50 million.

4

9.      During the course of Merger negotiations, CHT, Parmar, Zaharis, and Chivukula provided documents and other information to CC Capital regarding CHT's financial condition and business operations.

10.     The information provided by CHT, Parmar, Zaharis, and Chivukula was represented to be true and correct.  CC Capital, and, ultimately, CC Holdco, and their advisors – including KPMG, McKinsey & Company, and Winston & Strawn, LLP – reviewed and analyzed this information in deciding whether to agree to and, ultimately, to close the Merger.

11.     As the form of the proposed Merger took shape, CHT Holdco was formed as a single member limited liability company, with Alpha Cepheus, LLC ("Alpha Cepheus"), a Parmar controlled entity, being the sole member and Parmar acting as its Manager pursuant to the Limited Liability Company Agreement of CHT Holdco dated November 14, 2016.

12.     CC Holdco was also formed on November 14, 2016.

13.     Ultimately the terms and conditions of the Merger were agreed to and memorialized in the Merger Agreement, a Subscription Agreement dated November 24, 2016 (the "Subscription Agreement"), and other related agreements (each a "Transaction Document" and collectively the "Transaction Documents").

14.     As a condition and inducement to the Merger, CHT represented and warranted in the Merger Agreement, among other things:

        a.      that CHT's financial statements were truthful and accurate;

        b.      that there were no false entries on any of CHT's books and records;

        c.      that CHT's accounts receivable were the result of bona fide transactions; and

        d.      that CHT's material contracts were valid and enforceable.

5

15.    In the Subscription Agreement, the Sellers (which include Parmar, along with Alpha Cepheus, First United Health, LLC, and Constellation Health, LLC,[3] each of which was and is controlled by Parmar), further represented and warranted, among other things that CHT's representations and warranties in the Merger Agreement, including each of those set forth above, were true and correct.

16.    In connection with the consummation of the transactions pursuant to the Merger Agreement and Subscription Agreement, CC Holdco was admitted as the controlling member of CHT Holdco pursuant to the terms of the Amended and Restated Limited Liability Company Agreement of CHT Holdco dated November 24, 2016 (and effective as of the Effective Time as such term is defined in the Merger Agreement) (the "Amended and Restated CHT Holdco Operating Agreement").

17.    As a condition of closing, the Subscription Agreement required that "[e]ach of the [ ] representations and warranties made by [the Company] and the Sellers in or pursuant to [the Subscription] Agreement or any other Transaction Document shall be true and correct in all material respects"  and the Merger Agreement and Subscription Agreement each required a senior officer of CHT and CHT Holdco, respectively, to execute a certificate verifying that the representations and warranties of those entities and the Sellers in the Merger Agreement and Subscription Agreement or in any other Transaction Document were true and correct in all material respects.  Parmar executed these certificates as President of CHT and as President of CHT Holdco.

---

[3] The Subscription Agreement defines "Sellers" as Parmar, Alpha Cepheus, First United Health, LLC, and Constellation Health, LLC.

18.     As further inducement and protection in the event of a breach of the Sellers'
representations, warranties, covenants or indemnity obligations under the Subscription
Agreement, (i) Parmar, as Manager of Alpha Cepheus, executed a Pledge and Security
Agreement, granting CC Holdco a first priority security interest and continuing lien in all right,
title and interest in membership interests in CHT Holdco held by Alpha Cepheus and (ii) Parmar,
as Manager of the other Sellers (i.e. Constellation Health, LLC and First United Health, LLC),
executed Pledge and Security Agreements granting CC Holdco a first priority security interest
and continuing lien in all right, title and interest in the membership interests held by such Sellers
in Alpha Cepheus.

19.     Based upon the information provided by CHT, Parmar, Zaharis, and Chivukula,
CC Holdco and CC Capital believed that a fair valuation for CHT was in excess of $309 million.
Based on this valuation, pursuant to the Merger Agreement, at the closing of the Merger each
share of CHT common stock outstanding would be cancelled and converted into the right to
receive $2.93 in cash and $0.43 in a promissory note for each CHT share, which represented a
45% premium to the AIM closing price of CHT shares the day before the Merger was
announced.

20.     In deciding to enter into the Merger Agreement, the Subscription Agreement, the
Amended and Restated CHT Holdco Operating Agreement, and the other Transaction
Documents, and consummate the transactions thereunder, CC Capital, and, ultimately, CC
Holdco, relied upon the representations and warranties contained in such Transaction Documents
and the other information provided to them by CHT, Parmar, Zaharis, and Chivukula.

## THE PURCHASE PROCEEDS

21.    In anticipation of and in connection with the closing of the Merger, between January 24, 2017 and January 30, 2017, CC Capital and its related investors deposited a total of $82,502,260.25 into a CC Holdco bank account maintained at J.P. Morgan Chase ("CC Holdco Bank Account").  The account was established by CC Holdco and was opened in its name.

22.    On January 30, 2017, Debtor Orion, as borrower under a Credit Agreement with Bank of America, N.A., deposited $130,000,000 into the CC Holdco Bank Account.

23.    As a result of the deposits by CC Holdco's investors and Orion, the balance of the CC Holdco Bank Account on January 30, 2017 was $212,502,269.25.  These monies, referred to below as "Purchase Proceeds," were disbursed from the CC Holdco Bank Account to fund CHT Holdco's acquisition of CHT, along with the other expenses of the Merger.

### The Destra Litigation and Creation of the Young Conaway Escrow Fund

24.    On December 27, 2016, the Destra Targeted Income Unit Investment Trust (the "Master Trust"), on behalf of its unitholders, Constellation Health Group, LLC and Constellation Health, LLC, filed a Verified Complaint in Delaware Chancery Court commencing an action styled *Destra Targeted Income Unit Investment Trust, Constellation Health Group, LLC and Constellation Health, LLC v. Parmjit Singh Parmar (a.k.a Paul Parmar), Naya Constellation Health LLC, Alpha Cepheus, LLC, Constellation Health Investment, LLC, First United Health, LLC, Constellation Health, LLC, Joel Plasco, Sotirios Zaharis (a.k.a. Sam Zaharis),* Del. Ch., C.A. No. 13006-VCL (the "Destra Litigation"), asserting, *inter alia,* claims against Parmar and others for declaratory relief, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, fraudulent transfer, conversion, unjust enrichment, civil conspiracy, and fraud for conduct related to the operation of Southport Lane Management, LLC ("Southport").

8

25.    In the Destra Litigation, the plaintiffs therein alleged that Southport was a private

equity firm founded by Alexander Chatfield Burns ("Burns"). Southport was run by Burns, Joel

Plasco, Andrew Scherr, and others. In sum, the plaintiffs contended that Southport defrauded its

investors, most or all of whom were insurance companies, by siphoning off good, high-quality

assets, including cash, and exchanging them with "dubious investments," including seven

"synthetic preferred investments."

26.    The plaintiffs in the Destra Litigation alleged that one of Southport's "synthetic

investments" was Constellation Health, LLC ("CHLLC"), a joint business venture formed on

April 1, 2013 by Parmar and Southport as an investment vehicle for the purpose of acquiring

100% of the equity in Debtor Orion and its operating subsidiaries. According to the plaintiffs in

the Destra Litigation, on or about June 10, 2013, Southport paid $11 million to purchase a 55%

interest in CHLLC.  According to the Application for Admission to AIM (the "AIM Offering

Memorandum"), on June 17, 2013, CHLLC acquired 100% of the equity of Debtor Orion, and in

June 2014, investment entities managed by Parmar acquired all of the ownership interests of

CHLLC.  According to the AIM Offering Memorandum, on September 3, 2014, Debtor CHT

was formed to become the holding company for Orion and its subsidiaries for the purpose of a

public listing on the AIM.  According to the AIM Offering Memorandum, CHT was to acquire

the entire issued share capital of Orion immediately prior to CHT's admission to trading on the

AIM and immediately after its admission to trading on the AIM, CHLLC was to become the

controlling shareholder of CHT holding approximately 68.1 percent of the voting rights in CHT.

The going public transaction was consummated on December 8, 2014 and CHT was admitted to

trading on the AIM.

9

27.     In relevant part, the Master Trust alleged that Parmar had engaged in a series of breaches of fiduciary duty and fraudulent transfers such that Southport's 55% interest in CHLLC (and, ultimately, in CHT) had been misappropriated by Parmar and was held by various Parmar-controlled entities, including Blue Mountain Healthcare LLC ("Blue Mountain") and Alpha Cepheus.  As a result, the Master Trust alleged that it, as successor in interest to Southport, is the true owner of a substantial portion of CHT shares controlled by Parmar and thus it was entitled to receive certain other benefits of the Merger (i.e., payment of Purchase Proceeds).

28.     Prior to the filing of the Destra Litigation on December 27, 2016, neither CC Capital nor CC Holdco had knowledge of the allegations regarding Parmar's alleged breaches of fiduciary duty and fraudulent transfers of Southport's interest in CHLLC (and, ultimately, CHT).

29.     With the filing of the Destra Litigation, the plaintiffs moved for preliminary injunctive relief, seeking an injunction preventing the defendants and parties acting in concert with them from distributing cash and other securities that they would receive in connection with Merger.

30.     On January 25, 2017, the Delaware Chancery Court entered an Order Granting Motion for a Preliminary Injunction (the "Preliminary Injunction"), pursuant to which $55,267,485 of the Purchase Proceeds to be paid to defendant Parmar and entities he controlled was required to be placed into an escrow account to be held by Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), as escrow agent, pending the adjudication or resolution of the Destra Litigation.

## Closing and Disbursement of Purchase Proceeds

31.     The Merger closed on January 30, 2017.

32.    On January 30, 2017, $177,154,981.43 in Purchase Proceeds were transferred from the CC Holdco Bank Account to an account at the Royal Bank of Scotland, plc. maintained by Capita Registrars, Limited ("Capita"), the exchange agent for the Merger.  Capita then disbursed those Purchase Proceeds to CHT shareholders, including public shareholders and entities controlled by or affiliated with Parmar.

33.    On or about February 3, 2017, $49,918,984.28 in Purchase Proceeds were wired from the Capita account to the Young Conaway escrow account maintained at Wilmington Savings Fund Society in accordance with the Preliminary Injunction entered in the Destra Litigation.  These funds were Purchase Proceeds due to be paid to Blue Mountain, a Parmar controlled entity that held shares of CHT.

34.    On January 30, 2017, $5,348,500.72 in Purchase Proceeds were wired from the CC Holdco Bank Account to the Young Conaway escrow account.  These funds were Purchase Proceeds due to be paid to Alpha Cepheus in connection with the Merger.  Together with the Purchase Proceeds due to Blue Mountain, the Purchase Proceeds transferred to the Young Conaway escrow account totaled $55,267,485 (the "Young Conaway Escrow Fund"), as required by the Preliminary Injunction.

35.    On January 30, 2017, $9,520,035.90 in Purchase Proceeds due to be paid in connection with the Merger were transferred from the CC Holdco Bank Account to an account in the name of Debtor Orion in Lawrenceville, Georgia.

36.    On January 30, 2017, $2,930,000 in Purchase Proceeds due to be paid in connection with the Merger were transferred from the CC Holdco Bank Account to an account in the name of Platform Securities KKCLT (beneficial owner, Richard Griffiths) at National Westminster Bank, plc, in London, United Kingdom.

37.　　On January 30, 2017, $8,413,495 in Purchase Proceeds due to be paid in connection with the Merger were transferred from the CC Holdco Bank Account to an account at in the name of Canaccord Genuity Wealth at HSBC.

38.　　On January 30, 2017, $7,843,621.72 in Purchase Proceeds due to be paid in connection with the Merger were transferred from the CC Holdco Bank Account to an account in in the name of AAKB Investments Limited at Investec Bank Chanel Islands Ltd. in Guernsey. Upon information and belief, AAKB is affiliated with Parmar. Pavan Bakshi, the beneficial owner of AAKB, is Parmar's cousin and is a former director of CHT.

39.　　On January 30, 2017, $630,067.20 in Purchase Proceeds due to be paid in connection with the Merger were transferred from the CC Holdco Bank Account to an account in the name of Max Royde at the London branch of UBS AG.

40.　　On January 30, 2017, $661,558.28 in Purchase Proceeds due to be paid to Alpha Cepheus in connection with the Merger were wired from the CC Holdco Bank Account to an attorney escrow account maintained at Wells Fargo by Robinson Brog Leinwand Greene Genovese & Gluck, P.C. ("Robinson Brog"), who represented CHT in connection with the Merger and who also represented Parmar in the Destra Litigation.

41.　　In sum, all of the Purchase Proceeds were disbursed from the CC Holdco Bank Account on January 30, 2017 and, in exchange, CHT Holdco became the owner of all of the issued and outstanding shares of CHT.

42.　　On February 3, 2017, approximately $25.8 million were wired from the Capita account to the Robinson Brog escrow account. These funds were Purchase Proceeds due to be paid to PPSR Partners, LLC, PBPP Partners, LLC, MYMSMD, LLC, Lexington Landmark Services LLC, Vega Advanced Care LLC, Axis Medical Services LLC, and Pulsar Advance

12

Care.  Upon information and belief, all of these entities are controlled by or affiliated with Parmar.

43.    On February 3, 2017, approximately $20.1 million were wired from the Capita account to the Robinson Brog escrow account.  These funds were Purchase Proceeds due to be paid to PBPP, LLC, a Parmar controlled entity, in connection with the Merger.  On March 15, 2017, the federal government seized the $20.1 million in Purchase Proceeds due to PBPP held in the Robinson Brog escrow account.[4]

44.    Approximately $10 million of the Purchase Proceeds was withheld by Capita for potential tax liabilities of the non-US selling shareholders.  According to the Declaration of Timothy J. Dragelin in Support of Chapter 11 Petitions and First Day Motions, on December 29, 2017, Capita transferred the $10 million in withheld funds into Orion's main operating account at J.P. Morgan Chase Bank, and CHT then caused Orion to transfer the funds to the Internal Revenue Service ("IRS") on January 16, 2018, at the same time advising the IRS that the funds were the result of a potentially fraudulent transfer.

### Discovery of the Fraud

45.    Upon closing the Merger, CHT's Board of Directors was reconstituted, with CC Holdco appointing the majority of the directors.  Parmar continued as a director. Parmar, Zaharis, Chivukula, and others continued to manage the business and controlled the books and records of CHT.

46.    In or about April 2017, Truc To ("To"), the KPMG partner who had led the financial diligence efforts in connection with the Merger, was hired as Chief Financial Officer of

---

[4] Neither CC Capital, CHT Holdco, CC Holdco nor any of their designated directors on CHT's board of directors were aware of this seizure until late 2017.

CHT.  The hiring of To was part of an effort by the newly constituted Board of Directors to improve CHT's financial and accounting processes and reporting and to exercise increased oversight over these processes.

47.    In or about September 2017, Parmar complained about To and the increased oversight (which he characterized as interference) and tendered his resignation as Chief Executive Officer of CHT.   CHT's Board of Directors accepted Parmar's resignation as CEO on or about September 14, 2017.

48.    Following Parmar's resignation as CEO, To and others gained access to accounting systems and other financial and operational information that had previously been controlled and guarded by Parmar.  With access to this information, questions and concerns quickly emerged about the state of CHT's business operation and, ultimately, whether the information provided by CHT during the Merger negotiations, as well as the express representations and warranties made in connection with the Merger, were accurate.

49.    The emerging questions and concerns regarding CHT were addressed with Parmar, who provided various explanations.  These conversations culminated in a specially called meeting of CHT's Board of Directors on or about September 29, 2017.  During that meeting, Parmar disclosed that CHT's consolidated revenue and EBITDA for 2017 were approximately $70 million less and $50 million less, respectively, than the amounts indicated during the Merger negotiations. Parmar resigned as a director of CHT.

50.    Zaharis and Chivukula were placed on administrative leave and then terminated on October 13, 2017 after refusing to be interviewed and refusing to return their CHT computers.

51.    CHT and CC Capital, on behalf of CC Holdco and CHT Holdco, accelerated the investigation into CHT's financial condition and the circumstances of the Merger.  As a result, it

is now clear that CHT, Parmar, Zaharis, and Chivukula, likely in concert with other selling

shareholders and/or others acting on behalf of CHT, provided CC Capital, CC Holdco and CHT

Holdco with false and inaccurate information and withheld accurate information with the specific

intent of inducing CC Capital, CC Holdco, and CHT Holdco to enter into the Merger.  The

misrepresentations and material omissions include:

    a.    ***Sham Customers and Customer Receipts.***  A substantial number of the
customers and associated revenue of Orion, CHT's largest subsidiary,
were fictitious.  It was determined that Parmar and his associates created
fictitious revenue for non-existent customers by creating the appearance of
collected cash.  They accomplished this in one of two ways: (1) cash
raised from the secondary offerings was transferred from an M&T Bank
account to an operating account and re-characterized as customer receipts;
and (2) Orion's bank statements were altered to include entries that were
unsupported by any cash transfer in order to create the illusion of customer
deposits.

    b.    ***Altered/Fabricated Documents.***  Parmar, Zaharis, and Chivukula altered
and/or fabricated documents, including bank records, accounting records,
and customer contracts, to create the illusion of revenue.

    c.    ***Materially Inaccurate and Falsified Financial Statements.***  CHT's
financial statements for 2015 and 2016, including those filed with the AIM
and those provided to CC Capital, CHT Holdco, and CC Holdco during
diligence, were materially inaccurate.  For the six-month period ending
June 30, 2016, CHT's fabricated operations gave rise to a vast

15

overstatement of revenue and EBITDA.  The fictitious revenue from

MDRX, Phoenix, and Orion alone totaled approximately $30.9 million for

that six-month period.  Beyond these material inaccuracies, Parmar and his

conspirators also created fictitious financial statements for the entities

CHT "acquired," reflecting historical data for periods prior to those

entities' existence, which also were provided to CC Capital and CC

Holdco during diligence.

d. **Sham Acquisitions.**  The MDRX, Phoenix, and NorthStar transactions,

touted by Parmar and others as fueling CHT's growth, were shams.  In

general, these purported transactions shared common characteristics:

money was raised through secondary public offerings on the AIM; the

acquisition "target" was formed by Parmar and his conspirators shortly

before the date of acquisition; and, while CHT's accounting records

indicate that the offering proceeds were used to fund the acquisitions, the

proceeds were in fact used for other purposes, including but not limited to,

the creation of fictitious customer receipts and revenue for other CHT

business units.   The CHT general ledger reflects payments of $8.5 million

and $7.5 million for the purchase of Northstar and Phoenix, respectively—

yet CHT's bank statements indicate that $15.8 million in proceeds from

the secondary offering were disbursed in multiple transactions unrelated to

the purchase of either Phoenix or Northstar.

e. **Sham Operations.**  Similarly, MDRX, Phoenix, and NorthStar, which

were represented to be operating businesses with their own customers and

16

revenue, were fictitious.  These operations, as well as associated customers, were non-existent.  For example, despite CHT's press release announcing the NorthStar acquisition, which describes NorthStar as having 233 employees, 77 clients, and $7.9 million in revenue for FY2014, there is no customer revenue recorded in CHT's books and records for any NorthStar customer.   Similarly, CHT issued a press release relating to its acquisition of Phoenix that reported Phoenix as having 138 employees, $9.8 million in revenue, EBITDA of $2.2 million, and net assets of $1.1 million as of December 31, 2014, yet Phoenix did not have a bank account or EIN until after the acquisition.

52.     Parmar, his affiliated entities, and his co-conspirators profited enormously by the knowing misrepresentations made to CC Capital, CC Holdco, and CHT Holdco in connection with the Merger.

53.     Had CC Capital, CC Holdco, and CHT Holdco possessed the true facts in January 2017 regarding CHT's sham business operations and financial condition, as summarized herein, CHT Holdco would not have purchased CHT and CC Holdco would not have funded approximately $82.5 million in Purchase Proceeds.

**Proposed Settlement of the Destra Litigation**

54.     In or about August 2017 (as the financial oversight at CHT was increasing), Parmar and the plaintiffs in the Destra Litigation agreed to settle and compromise those claims by dividing the Young Conaway Escrow Fund among themselves.  Pursuant to the terms of a Settlement and Release Agreement, executed in late August 2017 (the "Settlement Agreement"), the Young Conaway Escrow Fund was to be distributed as follows: $32,283,132.53 to the Master

Trust; $10,849,716.59 to Blue Cross Blue Shield of South Carolina, as successor in interest to Companion Property & Casualty Insurance Company; $3,117,150.88 to the Honorable Trinidad Navarro, Insurance Commissioner of the State of Delaware, in his capacity as the Receiver (the "Receiver") of Freestone Insurance Company, in Liquidation; and all remaining funds to Parmar.

55.    On September 11, 2017, the Receiver, as a party to the Settlement Agreement, filed a Verified Petition to Approve Settlement and to Direct Distribution of Settlement Amount From Escrow (the "Settlement Petition") in *In the Matter of the Liquidation of Freestone Insurance Company*, C.A. No. 9574-VCL (the "Freestone Proceeding"), which was also pending in the Delaware Chancery Court.

56.    Having discovered the fraud as described above, on October 27, 2017, CC Capital, CC Holdco, CHT Holdco, and CHT filed an Objection to Settlement and Distribution of Escrow in the Freestone Proceeding.  In effect, this was a "placeholder objection" intended to meet the deadline established by the Chancery Court in the Freestone Proceeding, with the more substantive objection to be filed at a later date.

57.    On November 17, 2017, CC Capital, CC Holdco, and CHT Holdco (but not CHT) filed a Supplemental Objection to the Receiver's Petition to Approve Settlement Concerning Constellation Health.  This objection and other related filings made by the parties were filed under seal.

58.    In sum, CC Capital, CC Holdco, and CHT Holdco objected to the Settlement Petition on the grounds that the proceeds to be distributed under the terms of the proposed Settlement Agreement – i.e., the Young Conaway Escrow Fund – were fraudulently obtained by Parmar and his affiliated entities, Alpha Cepheus and Blue Mountain.  As a result of the fraud, the Young Conaway Escrow Fund was impressed with a constructive trust for the benefit of CC

18

Holdco and CHT Holdco. CC Capital, CC Holdco, and CHT Holdco requested that the Chancery Court stay the distribution of the Young Conaway Escrow Fund until their various claims for fraud and related causes of action could be adjudicated or resolved.

59.     On or about December 8, 2017, the federal government obtained seizure warrants for the $55,267,485 in the Young Conaway Escrow Fund ("Seizure Warrant").

60.     On December 12, 2017, the Chancery Court conducted a hearing on the Settlement Petition during which the effect of the Seizure Warrant was raised by the Court. In effect, the Court requested that counsel communicate with the United States Department of Justice ("USDOJ") for the purpose of obtaining additional information regarding the Seizure Warrant and its effect on the proposed settlement.

61.     On December 19, 2017, the USDOJ, through Receiver's counsel, filed a letter in the Freestone Proceeding, which was followed by letter submissions from the Receiver and from CC Capital, CC Holdco and CHT Holdco.

62.     The Settlement Agreement expired by its terms on January 26, 2018.

63.     On January 29, 2018, at the request and direction of the Chancery Court, CC Capital, CC Holdco, and CHT Holdco filed a Motion to Lift Preliminary Injunction previously entered in the Destra Litigation seeking an order lifting the Preliminary Injunction for the sole and exclusive purpose of allowing the USDOJ to execute the previously issued and served Seizure Warrant.

64.     On March 16, 2018, the Chancery Court conducted a hearing on the Motion to Lift the Preliminary Injunction. The motion was granted and the Chancery Court entered an order that provides as follows:

1.  The injunctive relief provided for in the Preliminary Injunction is hereby lifted for the sole and exclusive purpose of permitting the entirety of the Escrowed Funds, subject only to Paragraph 3, below, to be seized by the federal government in accordance with the pending seizure warrant (the "Seizure").

2.  Following the Seizure, the entirety of the Escrowed Funds shall be administered by the federal government in accordance with federal law and shall no longer be subject to the jurisdiction of this Court. The Escrowed Funds shall remain in the escrow account of Young Conaway until the USDOJ or the Court issuing a seizure warrant provides or causes to be provided to Wilmington Savings Fund Society ("WSFS") instructions concerning the Escrowed Funds, and Young Conaway and WSFS are authorized to comply with those instructions without further order of this Court and regardless of any opposition by any other person including any party to these actions.

**<u>Orion Bankruptcy Filing and Adversary Proceedings</u>**

65.     On the evening of March 16, 2018, CHT, Orion, and their other debtor affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").

66.     On Monday, March 19, 2018, counsel for the Debtors delivered a letter to Young Conaway providing notice that "the CHT Debtors assert an interest in [the Young Conaway Escrow Fund]" and asserting that the automatic stay pursuant to Section 362 of the Bankruptcy Code prohibited disbursement of the Young Conaway Escrow Fund.

67.     Neither CC Capital, CC Holdco, CHT Holdco, nor their counsel were aware that the Debtors asserted that the Young Conaway Escrow Fund was an asset of the Debtors' estate prior to delivery of the letter to Young Conaway on March 19, 2018.

68.     On March 29, 2018, the Debtors filed a complaint in this Court and commenced the Capita Adversary Proceeding.

69.     On April 4, 2018, the Debtors filed a complaint in this Court and commenced the Parmar Adversary Proceeding.[5]

70.     In the Capita Adversary Proceeding, the Debtors seek to recover the Purchase Proceeds disbursed from the CC Holdco Bank Account in connection with the Merger based upon claims for actual and constructive fraudulent transfers asserted under federal bankruptcy law and the Delaware Uniform Fraudulent Transfer Act.  In addition, the Debtors seek to impress a constructive trust on the monies paid to the IRS (described in ¶ 44, above) and to enjoin the IRS from disbursing those monies during the litigation of the Capita Adversary Proceeding.  The defendants in the Capita Adversary Proceeding include Capita, the exchange agent for the Merger; some or all of the public shareholders (or their agents); certain Parmar-controlled entities (e.g., Blue Mountain, PBPP Partners); and entities affiliated with individuals who have a relationship with Parmar (e.g., AAKB Investments Limited).  Of significance to this Motion, CHT Holdco, which was not a recipient of any Purchase Proceeds, is erroneously or improperly named as a defendant in the Capita Adversary Proceeding.

71.     In the Parmar Adversary Proceeding, the Debtors assert claims for fraud, breach of fiduciary duty, unjust enrichment, replevin, and actual and constructive fraudulent transfers asserted under federal bankruptcy law and the Delaware Uniform Fraudulent Transfer Act.  The Debtors seek a broad range of relief including: turnover of the Young Conaway Escrow Fund, claiming that the monies are an asset of the Debtors' bankruptcy estate(s); to impress a constructive trust on the Young Conaway Escrow Fund; enjoining the enforcement of the Seizure Warrant against the Young Conaway Escrow Fund; and recovery of Purchase Proceeds

---

[5] It is unclear why the Debtors have filed two Adversary Proceedings arising from and related to a single transaction – i.e., the Merger.  Movants believe that these actions should be consolidated into a single case.

and other damages from certain defendants.  In addition, the Debtors seek a declaratory judgment that the Debtors' rights to the monies in the Young Conaway Escrow Fund are superior to the rights of any of the defendants.  The defendants in the Parmar Adversary Proceeding include the individuals primarily responsible for perpetrating the fraud in connection with the Merger (i.e., Parmar, Zaharis, and Chivukula); certain Parmar-controlled entities (e.g., Blue Mountain, Alpha Cepheus); the Master Trust, who asserts an interest in the Young Conaway Escrow Fund; Young Conaway, as escrow agent; and, United States of America, the party seeking to seize and administer the Young Conaway Escrow Fund through the USDOJ.

72.    In both the Capita and Parmar Adversary Proceedings, the Debtors do not purport to assert claims on behalf of CC Holdco or CHT Holdco, nor do they acknowledge that CC Holdco and CHT Holdco have an interest in the Young Conaway Escrow Fund, the monies held by the IRS, or any of the other Purchase Proceeds that the Debtors seek to recover in those proceedings.

## CC HOLDCO'S AND CHT HOLDCO'S CLAIMS AND REMEDIES

As the purchasers of interests in CHT Holdco and the shares of CHT in connection with the Merger, CC Holdco and/or CHT Holdco have viable claims against many of the defendants named in the Capita Adversary Proceeding and Parmar Adversary Proceeding, including, but not necessarily limited to:

- Common law fraud against CHT, Parmar, Zaharis, and Chivukula;

- Aiding and abetting fraud against the Parmar-controlled entities, including Alpha Cepheus and Blue Mountain;

- Violations of state and federal securities laws against CHT, Parmar, Zaharis, Chivukula, as well as the Parmar-controlled entities such as Alpha Cepheus and Blue Mountain;

- Unjust enrichment against all selling shareholders;

- Replevin; and,

- Fraudulent transfer claims against the Parmar-controlled entities, including Alpha Cepheus and Blue Mountain.

CC Holdco and/or CHT Holdco are entitled to recover some or all of the Purchase Proceeds paid in connection with the Merger, as well as other damages.

As indicated in the Debtors' complaints in the Capita Adversary Proceeding and Parmar Adversary Proceeding, the remedy of constructive trust is applicable here.  However, the Debtors allegations ignore critical facts that demonstrate that both CC Holdco and Orion are the beneficiaries of any constructive trust(s) consisting of identifiable Purchase Proceeds – e.g., the Young Conaway Escrow Fund and the monies held by the IRS.

As more specifically described above, as well as in the Debtors' complaints in the Capita Adversary Proceeding and Parmar Adversary Proceeding, the Purchase Proceeds totaled $212,502,269.25.  The respective sources of those funds were Orion and CC Holdco.  Orion deposited $130,000,000 (61.2%) into the CC Holdco Bank Account and CC Holdco, through its investors, deposited $82,502,269.25 (38.8%) into the same account, so that the account balance at the time of the closing of the Merger totaled $212,502,269.25.  The Purchase Proceeds were disbursed from the CC Holdco Bank Account to fund CHT Holdco's purchase of CHT shares. At the very least, the money in the Young Conaway Escrow Fund and the money paid to the IRS are directly traceable as Purchase Proceeds disbursed from the CC Holdco Bank Account.

Delaware law is clear:  A constructive trust arises when "a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom

he owed some duty." *Adams v. Jankouskas*, 452 A.2d 148, 152 (Del. 1982). As stated by the

Delaware Supreme Court:

> If one party obtains legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, *but in any other unconscientious manner*, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner.

*Id.* at 152 n.4 (emphasis added).  A constructive trust may be imposed upon specific property or

identifiable proceeds of specific property, and even money so long as it resides in an identifiable

fund to which the plaintiff can trace equitable ownership.  If the unjustly obtained funds can be

traced into specific property, then a constructive trust can be imposed on the property, regardless

of the culpability of the party possessing the property, provided that the person or entity that

received the funds was not a bona fide purchaser for value.  *B.A.S.S. Group, LLC v. Coastal*

*Supply Co.*, Civil Action No. 3743-VCP, 2009 Del. Ch. LEXIS 166, *30 & n.70 (Del Ch. June

19, 2009) (quotation marks and citations omitted).

Here, the Purchase Proceeds were disbursed from the CC Holdco Bank Account as the

result of an extensive fraudulent scheme perpetrated by CHT, Parmar, Zaharis, Chivukula and

others.  Accordingly, those monies were and are impressed with a constructive trust for the

benefit of those who provided them – i.e., Orion and CC Holdco.  To the extent that Purchase

Proceeds are identifiable, such as the Young Conaway Escrow Fund and the money held by the

IRS, they are recoverable by Orion *and* CC Holdco in proportion to their original contributions.

## ARGUMENT

The facts demonstrate that CC Holdco and CHT Holdco have an interest in the Merger

that is the subject matter of the Capita Adversary Proceeding and Parmar Adversary Proceeding,

as well as an interest in the Young Conaway Escrow Fund and the monies held by the IRS. Moreover, each of CC Holdco and CHT Holdco has claims against a substantial number of the defendants named in each of the Adversary Proceedings complaints. Accordingly, CC Holdco and CHT Holdco should be permitted to participate as parties in each of those Adversary Proceedings. CC Holdco seeks to intervene as a plaintiff in both actions, and CHT Holdco seeks to intervene as a plaintiff in the Parmar Adversary Proceeding. CHT Holdco is erroneously named as a defendant in the Capita Adversary Proceeding. Accordingly, it has no need to intervene, but seeks realignment of the parties so that it is a named plaintiff in that action.

I.    **CC Holdco Should be Permitted to Intervene as a Matter of Right in Both Adversary Proceedings, and CHT Holdco Should be Permitted to Intervene in the Parmar Adversary Proceeding as a Matter of Right.**

Federal Rule 24, as made applicable to adversary proceedings by Bankruptcy Rule 7024, provides for intervention as a matter of right to *anyone* who:

(1)  is given an unconditional right to intervene by federal statute; or

(2)  claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).  For the reasons that follow, this Court should permit CC Holdco and CHT Holdco to intervene in these Adversary Proceedings to adjudicate their valid, substantial, and superior interests in the funds at issue.

A.    **CHT Holdco Has an Absolute Right to Intervene by Federal Statute in the Parmar Adversary Proceeding.**

As an equity holder, CHT Holdco has an unconditional right to intervene in the Parmar Adversary Proceeding pursuant to Section 1109(b) of the Bankruptcy Code and Federal Rule

24(a)(1).  Section 1109(b) of the Bankruptcy Code, the federal statute granting such

unconditional right to CHT Holdco to intervene, provides in pertinent part:

> A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, *an equity security holder*, or any indenture trustee, may raise and may appear and be heard on any issue is a case under this chapter.

11 U.S.C. § 1109(b) (emphasis added).

In construing Federal Rule 24(a)(1), bankruptcy courts have broadly interpreted Section

1109(b) of the Bankruptcy Code to include a right to intervene in all adversary proceedings

associated with an underlying bankruptcy.  *See, e.g.*, *In re Caldor Corp.*, 303 F.3d 161, 168–9

(2d Cir. 2002); *Adelphia Commc'ns Corp. v. Rigas*, 285 B.R. 848, 858 (Bankr. S.D.N.Y. 2002);

*Matter of Marin Motor Oil, Inc.*, 689 F.2d 445, 449 (3d Cir. 1982).  Accordingly, CHT Holdco,

as an express party in interest under Section 1109(b) of the Bankruptcy Code, has an absolute

right to intervene in the Parmar Adversary Proceeding.

**B.     CC Holdco and CHT Holdco Have an Interest in the Transaction and the Property That is the Subject of the Adversary Proceeding and Should be Permitted to Intervene as a Matter of Right.**

CC Holdco and CHT Holdco have an interest in the Merger that is the subject of both

Adversary Proceedings, as well as the identifiable Purchase Proceeds in issue in those cases –

i.e., the Young Conaway Escrow Fund and the monies held by the IRS.  Moreover, it is evident

that their interests are not being adequately protected in either of the Adversary Proceedings.

Accordingly, they have the right to intervene and assert their claims in each of those actions.

The "interest" contemplated by Federal Rule 24 must at least be a "significantly

protectable interest" that is directly and substantially "relat[ed] to the property or transaction

which is the subject of the action."  *Sec. Investor Protection Corp. v. Bernard L Madoff Inv. Sec.*

26

*LLC*, 550 B.R. 241, 249–50 (Bankr. S.D.N.Y. 2016) (citations omitted); *see also Peterson v. Islamic Republic of Iran*, 290 F.R.D. 54, 59–60 (S.D.N.Y. 2013) (granting motion where proposed intervenors had a "cognizable interest" in the recovery of the funds at issue and at least a colorable argument that they should recover over some of the plaintiffs); *Willis v. Firestone Bldg. Prods. Co.*, 231 F.R.D. 447, 449–50 (D. Conn. 2005) (granting employer's motion to intervene because it paid benefits related to injuries claimed in the case and thus validly would compete with the plaintiff-employee for a portion of the recovery).

The complaints in the Adversary Proceedings, as well as the factual background set forth above, confirm that CC Holdco and CHT Holdco have a valid, direct, and cognizable interest in the Merger consideration-turned-Purchase Proceeds. CHT Holdco was the purchaser of the CHT shares acquired in the Merger. (*See* Capita Adv. Proc. Compl. ¶ 2; Parmar Adv. Proc. Compl. ¶ 1). CC Holdco was the controlling member of CHT Holdco and directly funded approximately $82.5 million of the approximately $212.5 million in Merger consideration (i.e., the Purchase Proceeds). (*See* Capita Adv. Proc. Compl. ¶ 13; Parmar Adv. Proc. Compl. ¶ 12). As the Debtors similarly contend, Parmar and various entities or individuals affiliated or controlled by him induced Movants to participate in the Merger by falsely representing CHT's financial status. (*See* Capita Adv. Proc. Compl. ¶ 63; Parmar Adv. Proc. Compl. ¶ 77). As victims of the fraudulent scheme that induced and gave rise to the Merger, CHT Holdco and CC Holdco have claims against many, if not all, of the defendants named in the Capita Adversary Proceeding and Parmar Adversary Proceeding.

Denying CC Holdco and CHT Holdco from intervening in the Adversary Proceedings would be unduly prejudicial given their valid interest in the identifiable Purchase Proceeds. These interests should be evaluated by this Court in the same action in which "parallel claims"

27

are asserted and "parallel relief" is sought by the Debtors.  (*See* Capita Adv. Proc. Compl. ¶¶ 1,
18, 20; Parmar Adv. Proc. Compl. ¶¶ 1, 17, 19).  CC Holdco's and CHT Holdco's inclusion in
these Adversary Proceedings would equitably and efficiently resolve all claims of interest to any
recoveries, including the identifiable Purchase Proceeds, as well as eliminate the risk of
competing cases and the possibility of inconsistent findings.  Finally, Debtors, by virtue of their
duties to parties in interest to the bankruptcy proceeding and their own interests in the Adversary
Proceedings, cannot adequately protect Movants' interests.  Federal Rule 24(a)(2) compels this
Court to grant CC Holdco and CHT Holdco the right to intervene as a matter of right.

   C.    **Even if this Court Determines that Intervention as a Matter of Right is Not
         Warranted, CC Holdco and CHT Holdco Should, Nonetheless, be Permitted
         to Intervene.**

Federal Rule 24(b)(1)(B) provides that, *anyone* may be permitted to intervene who "has a
claim or defense that shares with the main action a common question of law or fact."  This Court
has broad discretion to grant permissive intervention.  *Restor-A-Dent Dental Labs., Inc. v.
Certified Alloy Prods., Inc.*, 725 F.2d 871, 876 (2d Cir. 1984).  Indeed, Rule 24 provides that the
court must only "consider whether the intervention will unduly delay or prejudice the
adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).

Here, permissive intervention is warranted because CC Holdco's and CHT Holdco's
claims share common questions of law and fact with the Debtors' claims.  Namely, CC Holdco
and CHT Holdco seek to assert similar causes of action and obtain relief similar to that claimed
by the Debtors, all arising from and related to the Merger.  (*See* Capita Adv. Proc. Compl. ¶¶ 1–
2, 18, 20; Parmar Adv. Proc. Compl. ¶¶ 1, 17, 19).  Given the infancy of these proceedings,
permitting CC Holdco and CHT Holdco to intervene would not unduly delay the adjudication of
the Debtors' rights.  Nor would intervention prejudice Debtors' rights as Movants do not dispute

28

Debtors' claims for relief or seek to claim any portion of the monies belonging to Debtors. Rather, Movants seek relief for only the portion of the Purchase Proceeds funded by them. Further, similar findings of fact and determinations of law are required to adjudicate Debtors' and Movants' claims.

## II.    CHT Holdco Should Be Realigned as a Plaintiff in the Parmar Adversary Proceeding.

In the Capita Adversary Proceeding, the Debtors allege that CHT Holdco received approximately $30,274,165.87 in Purchase Proceeds in connection with the closing of the Merger.  (*See* Appendix A, Capita Adv. Proc. Compl.).  Not only did CHT Holdco not receive any Purchase Proceeds; it was the actual purchaser of the CHT shares in that transaction.  Hence, CHT Holdco's interests are adverse to the interests of the other defendants in the Capita Adversary Proceeding, which means that realignment of CHT Holdco as a plaintiff is appropriate and warranted.

In evaluating realignment, the court's duty is "to look beyond the pleadings and arrange the parties according to their sides in the dispute." *City of Indianapolis v. Chase Nat'l Bank of City of N.Y.*, 314 U.S. 63, 69 (1941) (citation and internal quotation marks omitted).  Indeed, "[t]he purpose of realignment is to ensure that the case truly involves the kind of adversarial relationship constitutionally required in a case or controversy in the federal courts." *Md. Cas. Co. v. W.R. Grace & Co.*, 23 F.3d 617, 622 (2d Cir. 1993) (*quoting* 1 James W. Moore et al., *Moore's Federal Practice* ¶ 0.74[7] (2d ed. 1993)).

The Second Circuit has adopted the "collision of interests" test, which requires realignment of the parties "according to their real interests." *Maryland Casualty*, 23 F.3d at 622. This analysis empowers this Court to consider the interests and issues of the entire record – such

as "actual and substantial ancillary or secondary issues to the primary issue" – rather than the

narrower approach of other circuits.  *Id*. at 623.  Thus, if the parties are misaligned for whatever

reason, this Court has the power to realign accordingly.  *See id.* (a court must "examine the

realities of the record to discover the real interests of the parties") (citation and internal quotation

marks omitted); *Gurney's Inn Resort & Spa Ltd. v. Benjamin*, 743 F. Supp. 2d 117, 124–25

(E.D.N.Y. 2010) (realigning two defendants as plaintiffs because there was no actual dispute or

controversy between them and the plaintiff); *L-3 Commc'ns Corp. v. OSI Sys., Inc.*, 418 F. Supp.

2d 380, 383 (S.D.N.Y. 2005) (finding that courts have broad discretion to realign parties and

order of proof) (citations omitted).

 That the Debtors erroneously named CHT Holdco as a defendant in the Capita Adversary

Proceeding does not bar CHT Holdco from aligning its interests with those of the Debtors, which

parallel its own.  CC Holdco funded approximately $82.5 million of the Purchase, while plaintiff

Orion funded approximately $130 million, all of which were used to fund CHT Holdco's

purchase of CHT shares.  (*See* Capita Adv. Proc. Compl. ¶ 13; Parmar Adv. Proc. Compl. ¶ 12).

CHT Holdco, along with the Debtors, was victim to Parmar's, and various entities or individuals

affiliated or controlled by him, scheme.  Therefore, the Court should "look beyond the

pleadings" and exercise its power to realign the parties so that CHT Holdco may prosecute its

claims correlatively with the other plaintiffs.  Realignment is in the interest of justice, is

consistent with the posture of the Adversary Proceedings, and is likely to avoid any confusion

and hardship throughout the remainder of these Adversary Proceedings.

## **CONCLUSION**

 For the foregoing reasons, CC Holdco and CHT Holdco respectfully request that this

Court grant the Motion to Intervene and Realign the Parties in both Adversary Proceedings, and

grant such other and further relief in favor of CC Holdco and CHT Holdco as the Court deems

just and proper.

Dated:  May 16, 2018
        New York, New York

TROUTMAN SANDERS LLP

By: */s/ Brett D. Goodman*
Mitchel H. Perkiel
Brett D. Goodman
875 Third Avenue
New York, NY 10022
(212) 704-6000
mitchel.perkiel@troutman.com
brett.goodman@troutman.com

-    AND    -

J. David Dantzler, Jr.
600 Peachtree St. NE
Suite 3000
Atlanta, GA 30308
(404) 885-3000
david.dantzler@troutman.com